THE FREDERICK E. IVES.

(District Court, S. D. New York. April 20, 1909.)

TOWAGE (§ 11*)—LOSS OF TOW—LIABILITY.

A tug, losing her tow while seeking an entrance in a fog to New Haven harbor through a sudden change of wind, *held* not liable for the losses, but the petition to limit granted.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

(Syllabus by the Judge.)

Robinson, Biddle & Benedict, for petitioner.
Wilcox & Green, for various claimants.
Carpenter, Park & Symmers, for Western Assurance Company.
James J. Macklin, for owners of two barges.

ADAMS, District Judge. The owner of the tug Frederick E. Ives seeks herein to limit and contest its liability for the loss of six coal laden barges, bound from points near New York for New Haven and New London, Connecticut, in a hawser tow. The barges were the Fannie Preston and the T. M. Righter in the hawser tier, the Edward F. Cullen and the H. W. Somers in the second tier and the Joseph W. Drayton and the Helen R. Cullen in the last tier. The Righter, the Somers and the Helen R. Cullen were the starboard boats. The tiers were about 15 feet apart. The hawser and bridle were about 100 fathoms long. The tow started from New York on the 12th day of February, 1908, reached the vicinity of Bridgeport the 14th, and anchored. The fog during the time the tow was near Bridgeport was dense and it remained so until after the loss. The master of the tug, having favorable indications of better weather from his barometer while near Bridgeport, however, concluded to go on and left there at high water, about 9:30 p. m., and started for New Haven. Reaching a point where, according to his soundings, he judged was in the vicinity of Sperry Light, on the easterly end of the West Breakwater off New Haven, he anchored, hauling the tow close up under the tug's stern.

There are three breakwaters at the entrance to the New Haven har-

bor; the West Breakwater, the Ludington Rock Breakwater and the East Breakwater. The space for entrance between the first two is somewhat less than three-eighths of a mile, while the space between the last two is nearly half a mile and is the one generally used. The first is very seldom used by tows. There is a siren connected with the Sperry lighthouse, but at the time in question it was so arranged that its sound was emitted from near the base of the house and instead of the horn being turned outward it was turned downward. Concededly, it was of little or no benefit at the time (though it has since been improved), and while it worked automatically, it was heard by no one on the tow until too late, and was practically useless.

The petition alleges that on the arrival of the tow in the vicinity of New Haven about 2:30 a. m., no attempt was made to go into New Haven harbor on account of the fog, but the tow anchored in 5½ fathoms in a safe anchorage to the westward of the West Breakwater.

Criticism is made by the claimants upon this method of navigating, inasmuch as if instead of attempting to go thence to the southward and subsequently endeavoring to find an entrance through the opening between the Ludington Breakwater and the West Breakwater, the tow had been taken to the northward from the anchorage, it would have been safe and in a good position to proceed further into the harbor when the fog lifted. Doubtless, as it turned out, this would have been a proper course to pursue but it would have been unusual for a tug in a fog to attempt such a method of entering, especially as she could not be certain of her position. In the existing condition of affairs, it was apparently better to wait for the lifting of the fog, which from appearances when off Bridgeport the master was reasonably entitled to expect, and in the meantime, to anchor. The fog did not lighten, however, and while waiting, the wind increased with some suddenness. Those on the tug say that the wind came out strong from the southward, even stated the velocity to have been as high as forty miles an hour. That was undoubtedly an overestimate. The New Haven weather records show there was little movement of the wind from 12 to 3 a. m.; that it increased to a velocity of ten miles an hour between 3 and 4 o'clock and to 18 miles between 4 and 5 o'clock. This does not corroborate the tug as to the strength but it does as to direction, south and southwest, and as to a sudden increase. Doubtless such a wind in the open water of the sound was enough to excite apprehension and the master properly determined it was time for some action on his part. He evidently could not remain at anchor, while a sea was being created, he therefore properly determined to seek protection. While he could not depend upon obtaining assistance from the foghorn at the east end of the breakwater, there was a possibility of hearing it in time. In the emergency, it would seem proper to seek that entrance to the harbor, as the most available one. He accordingly pulled a little distance to the southward and then shaped his course E. N. E., to clear the lighthouse and reach the entrance to the eastward of the light. The horn was not heard, however, until the tug was found to be almost on the breakwater, when the helm was put hard a port and the tug succeeded in escaping, but the wind and sea carried the boats of the tow quickly on the breakwater, where they filled and sank.

There are two principal disputes in the testimony: (1) Whether the tug did anchor, and (2) What the state of the weather was just before the tow struck.

(1) I think there can be no reasonable doubt that the tug anchored. All of her four witnesses have testified to it, the master, the mate, the deckhand and the engineer, and there was nothing in their appearance to indicate that they were testifying falsely. There was no substantial testimony in opposition. The one witness produced by the claimants to the contrary was the master of the Righter, and even he does not say positively that she did not anchor but merely: "I didn't see no anchor." Little credence can be given to what he said in view of the fact that in a protest sworn to at New Haven on the day of the accident no mention is made of the anchoring. This protest, in a general way, supports the claim of the tug with respect to the facts of the case. In it, this witness said:

"At 2:30 A. M of the 15th inst. we arrived off Sperry Light, New Haven. At that time there was a thick fog, dead calm. At 4:30 A. M. the wind breezed up south, southwest, with heavy sea, and it was made necessary for us to endeavor to get inside of the harbor. While trying to do so, we struck the Breakwater, designated as the West Breakwater. We heard no fog signal until after the barges had struck when they soon sank. Then we were up against the lighthouse where the barges are lying at the present time. I lost everything but what I had on."

It does not seem that the effect of this protest and the fact that that witness was the only one produced from the barges can be explained away by the statement that they (the barge masters) were "rounded up" by the petitioner in New Haven, immediately after the accident, and induced to make false statements under oath.

(2) The strength of the wind has been mentioned above. The tug's vindication depends upon the statements of those on the tug and the weather records. It is contradicted only by the master of the Righter and the lightkeeper and his wife. The two latter said, in substance, that there was no wind until about 7 or 8 o'clock, several hours after the disaster. It was conclusively shown to be otherwise and the credit to be given to these witnesses is affected by their erroneous statements in this and some other particulars.

The pleadings confirm, in some respects, the claim of the petitioner with regard to the weather. The answer of the Columbia Mining Company, the claimant of several of the boats and cargoes, states:

"Between 4 and 5 o'clock in the morning of February 15, a strong breeze from the southwest started up, and the wind and tide carried the tow on the breakwater."

It was argued for the claimants that the answers were prepared from the false protests but the one in evidence does not correspond with the statement quoted above.

It seems clear that it was necessary for the tug to get under way and endeavor to get into a harbor in order to protect her tow and she failed in the attempt for the reasons already stated.

It has been suggested that the tug should have sent a boat out to investigate. The master, however, did not know that he would be forced

to attempt an entrance at such short notice, and, in any event, the prudence of such a step is doubtful.

An argument has been made that the tug should not have ventured within the seven fathom line. What the master was properly trying to do, in the first instance, was to get in the vicinity of the entrance so that he could anchor and get inside as soon as possible. If the argument has reference to a duty on the part of the master to keep going to the southward until he reached that depth, it means that he would have been obliged to go a considerable distance further than he did, in a heavy southwest wind and sea, without achieving anything, because then he would have been no better off than when he did make the attempt.

It seems that the whole loss was attributable to the sudden increase of the wind, the necessity for a prudent navigator to seek harbor and the absence of any proper signal on the Sperry Light to aid the tug in her navigation. There may have been mistakes in judgment upon the part of the navigator but such mistakes do not create liability on the tug's part.

There is no question here about the right of the tug to limit her liability, and the petition is granted. As it has not been shown that there was any negligence on her part, the claims are dismissed.